U.S.A. v. Mohamed Zahour U.S.A. v. Tariq Omar U.S.A. v. Spilius Pappas Argument not to exceed 10 minutes for each defendant and 40 minutes for the plaintiff. Mr. Singal, you may proceed. Good afternoon, Mr. President.  Good afternoon, Your Honors. May it please the Court. Kyle Singal for Appellant Dr. Tariq Omar. I respectfully reserve two minutes for rebuttal. Dr. Omar raises three issues on appeal. The government's improper remarks attributing his co-defendant's conduct to him, improper evidence of his wealth, and the District Court's failure to apply Note 3E1 to U.S. Sentencing Guideline 2B1.1. I'd like to start with the first issue and focus the panel's attention on the two most egregious remarks that warrant reversal. The first is on Trial Day 13, page 6375. The prosecutor said, these defendants and their other co-conspirators had a meeting. They discussed how they were going to stay under the radar. The second is at page ID 6378, line 7. The government says right around January 2017, they had their meeting, quote, they all got together in a room and said, what are we going to do to make sure that we don't get caught? Why do you think, on the stay under the radar point, I did go to the transcript of the main conspirator and read his testimony, and the prosecutor seemed to seriatim go through each defendant and say, did you have this conversation with this defendant? Did you have this conversation with this defendant? And I think it did include Amar. Why is it problematic? Your Honor, I think you're referring to the testimony where Rashid, the cooperating witness, was asked whether he had a conversation about whether he told the doctors that Medicare only allowed four or five facet. And so in the context of that particular thing, sure, Rashid's testimony was that he had a conversation with Dr. Amar about the number of facet joint injections. But what I'm saying is, in summation to the jury, the prosecutor stated that in January 2017, Dr. Amar was among the people at a meeting when they decided, what are we going to do to make sure we don't get caught? And in fact, sure, that was false. He had stepped down in December 2016. And that's important because later in rebuttal summation, what the prosecutor said was, quote, we don't have to prove they committed fraud 20 different ways. We just have to prove they got together to commit fraud in one way for you to convict. So your point isn't that there was evidence that the main conspirator had told your client to stay under the radar. Your point is that there wasn't a meeting with all four defendants. And I don't know that the first set of testimony you're referring to was enough to justify it. It was really serious. Stay under the radar, though, I'm not sure that that lines up with that point in summation. I think that supported that Rashid believed he had told Dr. Amar to give fewer than four or five facet joint injections per year per patient. And I think that's different from, the key issue here was Dr. Amar's intent, right? Did he commit malpractice or did he know he was intentionally defrauding Medicare? And if he thought, as he testified, that he just did what he was told, that's different than he was part of a scheme to defraud Medicare and say, how can we as a group stay under the radar? How can we change our ways? Another point on page 6369 on the top of 6370 is the prosecutor said all of the providers and then said in late 2013, when they realized that Medicare was still paying, dot, dot, dot, they went back to their old ways and started billing. Well, Dr. Amar wasn't there then, right? But that's evidence of his intent to defraud Medicare rather than simply his overprescribing drugs, which is bad, but not what he was on trial for. And I think those misstatements, incidentally, those are the three misstatements, improper remarks, that the government doesn't even respond to in their brief. They respond to most of the points we made, but the three that I just mentioned, 6370, 6375, and 6378, I think warrant or require reversal under Carter, and I also note the government didn't address Carter in its brief. So I think that's the most compelling argument to reverse on the first issue. Why do you think, there is something to the idea that the government said that in many instances, it seems it was perfectly okay to refer to the defendants as a group, so long as you had an evidentiary basis that the factual statement that you are alleging applied to all of the defendants. That's why I'm not right now harping on, for example, when they said they billed $58 million, or they collectively prescribed $299,000, whatever. Sure, that they doesn't mean that every single person was part of the same collective each time. That said, the district court still sustained objections even to that use of they, which put the government on notice to stop using the they in that collective form, and trial counsel objected, I think, as much as he needed to, to continue that objection throughout, and even at the end of rebuttal summation said, you and I object, they're doing the they, they, they again. So this wasn't like an incidental use of they that was ambiguous. When the government said they all got together in January of 2017, that factually misstated whether Dr. Omar was at the meeting, and that one piece of evidence was sufficient to convict on intent, at least. If he was at a meeting where he decided, how am I going to stay under the radar, that's much different from following along with what the other doctors were doing and teaching him. Did Omar's counsel respond to that? You mean in his summation? Yeah. You know, I think he justifiably went through and focused on the evidence of intent, and the lack of intent, and argued about good faith, and tried to discredit the government's witnesses. Mostly it was Rashid, who was, you know, the quote is an underpentant fraudster. So is there a direct response to that? No, but the trial counsel did object on trial day 14 right afterwards. I've got the page set if you want it. It's page ID 6613, notes 10 to 14. And part of the reason I think the trial counsel did it that way is, back on day 3, page ID 4384, line 12, that was the first time this came up, was in day 3, earlier on in the trial, and trial counsel said they're doing this day thing. And the district court said, quote, keep track of the statements, and then we'll deal with it later. And so the district court invited trial counsel to keep track and not raise his hand every five minutes. Talking about a factual assertion that you say is not supported by the record.  It would seem to me to be a very simple matter to say to the jury, look, there was this meeting. Remember, my client wasn't there. Well, I guess two responses. One is under Carter, it isn't that the prosecutor is allowed to misstate evidence as long as the defense counsel has an adequate opportunity to respond. Carter said that attorneys, especially prosecutors who have the competence of the juries, are not supposed to misstate evidence, period. And the Carter test, which you can go back through all the other cases before, Leon, Bess, and Thomas, that's the Sixth Circuit binding question is that the prosecutor is not supposed to make these sorts of improper remarks. Secondly, if it was a strategic decision not to make the clarifying remark, it could have been that trial counsel didn't want to pit himself in a credibility war against the government. Maybe he wanted to focus on what he thought was the winning strategy of look at what Dr. Omar said, look at why he, honest to God, thought he was just following orders, and look at how the government's witnesses are not credible. And that could make sense. I don't think the case law required him to turn his summation into a credibility battle with the prosecutor. So I thought originally the case was peppered with delays, but now it's really boiled down to this one specific factual mistake. Are you going to hold prosecutors to strict liability on any factual mistake they make in closing arguments? I don't think the case law is strict liability, Your Honor. Step one is, is it improper? Is it improper? Includes, does it misstate the evidence? And then step two, depending on how you read the case law, is it flagrant? And part of that flagrancy analysis is how prejudicial was it? How much did it mislead? So any and all, and I don't think you need to craft your opinion in a way that opens the door to lots of challenges that would be. Why is the one factual mistake so glaring that it's sufficient? Again, I do think the other points that we've made in our brief are relevant. I highlighted the two, I think three most egregious examples because those were most relevant to Dr. Omar's intent to defraud Medicare, right? And that was at the end of the 15-day trial, the issue that the jury had to grapple with. And if, in fact, the jury believed that the prosecutor said he was part of the they who all got together and said, you know, what are we going to do to make sure we don't get caught and how are we going to stay under the radar? They all got together in the room. That would be fairly persuasive to a jury that he was part of this cabal to defraud Medicare. Well, if it was the only evidence, I suppose. Well, there wasn't much evidence of his intent. Well, I mean, you can infer intent from action, from things that he did, from giving this many injections, from, I mean, billing this much. And the jury might have believed. They can infer that, right? They can infer the intent. There's rarely evidence where he says, I intended to commit this crime. Right, right. And then the question is if we're, you know, looking at overwhelming evidence, was there overwhelming evidence of intent? And if you look at cases like U.S. v. Hazelwood from a couple years ago there, the evidence on intent, I'd argue, was far stronger that Mr. Hazelwood laughed and joked using language that was integral to a fraud. And yet the government reversed a conviction that was 404B. And so there was not overwhelming evidence of intent. So I think if you look at what counts as overwhelming evidence of intent, this isn't that. Was there some evidence? Sure. The jury could have looked at what Rashid said that he told Dr. Omar and could have looked at the medical records. But, again, the jury could have believed Dr. Omar that he didn't know anything about billing and just signed the forms, which is a pretty reasonable argument. Okay. Thank you, counsel. Thank you, Judge. I hope you'll have your rebuttal time. Thank you, Your Honors. Good afternoon, Your Honors. Edward Bejoka appearing on behalf of Joseph Bietro. And I'm reserving two minutes for rebuttal. I believe that the most important part of my arguments that I would like to highlight revolve around the prosecutorial misconduct that I believe occurred during this trial. And on page seven of my brief, and this is from the trial transcript 6580 to 6581, I think this portion of the prosecution's rebuttal is probably the strongest argument that I think Dr. Bietro has, that the guilty pleas of the co-defendants were used as substantive evidence during the closing argument. Jacob Foster, the U.S. attorney who handled the closing argument, said, Mashiad Rashid pled guilty to it. Yasser Mozeb pled guilty to being in a conspiracy with these four defendants right here. Abdul Haq, Manish Bolina, they pled guilty to committing crimes, doing the exact same things each one of these four defendants did. And so really the only question for you when you go back there is, were these defendants who were doing the same thing as everyone else at Tri-County doing the same thing as Haq and Bolina? Were they involved in a conspiracy or was it just a coincidence? This is plain language. And I really don't see how a juror or anyone could take it any differently than the way that it's stated, which is the messaging that you should use the co-defendants' guilty pleas as substantive evidence to find the trial defendants guilty. The case law on that type of argument is clear. We've laid it out in our brief. And it is certainly something that was intended, again, based on that plain language, to be used for substantive evidence, not for the permissible purpose of credibility or any other permissible purpose that Mr. Foster could have made those type of statements. I thought that there was some, that the guilty pleas had come up through the defense at one point. Is that right? Is the court referring to during cross-examination of these individuals? Yes. And it may not have been you or your, I don't know if it was one of the co-defendants. But we're all reading that somewhere. Sure. I'm certain that for each one of these witnesses that their pleas were used during cross-examination for credibility purposes by the defense. So the defense said, you know, you're a criminal. You pled guilty, correct, whatever. So why is it not appropriate for the government then to use that in their case, too? Sure, Your Honor. And it is appropriate if the government is using it for credibility purposes. But in this case, when you look at the language that Mr. Foster uses, it is clear that he is using it as substantive evidence. What he's saying is not, hey, you know, disregard the fact that these guys were cross-examined. And they got good deals to plead guilty. And this is what the defense is telling you. But, hey, they all pled guilty to it. And because they pled guilty, you should go back there and ask yourself the question of, were they doing the same thing, right? And so I think he crosses the line from using these pleas for a permissible purpose, which would be credibility, and asks the jury to use them as substantive evidence. But it's a unique case when it's a conspiracy, though, right? Because what if they had just said these other co-conspirators admitted that they conspired with the defendants? That's essentially what the plea was. It was an admission that they conspired with the defendants, which is pretty good evidence that the defendants were among the conspirators because their co-conspirators were implicating them. Would there be anything wrong with that? And why is that different than just saying that they pled guilty to a conspiracy? Sure. I think that what he says here crosses the line in that when he says they pled guilty to committing crimes, doing the exact same things, and the only question for you when you go back there. And I think it's that line or those two lines that cross the line here. It would be okay if the prosecutor had said they admitted their guilt to a conspiracy to defraud the government with the defendants. Therefore, you can take their testimony, their admission of guilt, which I assume they testified that they pled guilty, and suggest that these defendants are guilty, too, because their testimony implicates them. It's like direct evidence. Well, I don't think that he can say that because they've pled guilty that you should find these folks guilty. I think that he can use that, and as the case law says, you can use it for assessing credibility of the witness, but you can't use it for a prohibited purpose. But if it really is the difference between Rashid pled guilty versus Rashid admitted to entering into a conspiracy with these defendants, and you can use that, too, it doesn't strike me as all that prejudicial. Because they can say essentially the same thing, which is Rashid admitted the crime and implicated the defendants. And this is maybe just a cursory way of making the same point. Well, I believe it was prejudicial, Your Honor, and I think when you combine it with the other instances of prosecutorial misconduct that I believe occurred in this case, misstated evidence, Mr. Foster saying the fastest way for you to go home, and in relation to the jurors having been through this lengthy trial, and then misstating the law after he says the fastest way for you to go home, the use of the term fraudsters in connection to the fact that the defendant is guilty. So going back to your argument about guilt by implication, the judge gave a limiting instruction on that evidence, right? My memory serves, I believe she did. And I mean, why isn't the question basically a harmless reference? Well, Your Honor, again, I think when you take that in conjunction and in combination with the other instances of prosecutorial misconduct that I believe occurred in this case, I think it rises to the level of severely prejudicial. Your Honors, I think there's also a major issue regarding the improper use of witnesses, some of the physician witnesses as expert witnesses. I've laid that out, I think, sufficiently in my brief, and I only have about 30 seconds left, so I will... I mean, the trial court was conscious of that issue, wasn't it? I mean, that idea that a physician, you can have a treating physician, they could testify to facts, but not give opinions about causation. I mean, it's the kind of thing that you see often in cases. I think the judge was well aware of that, right? Your Honor, it was raised in a written motion. That written motion was never explicitly ruled upon, and it seemed to... I believe that Judge Hood gave different rulings at different times that seemed to conflict. And so I think it was sort of a moving target for what type of evidence was going to come in through these witnesses, because there was never a clear ruling. Okay. Thank you. Thank you, Your Honors. Good afternoon, Your Honors. My name is Fasil Gill, and I'm representing Dr. Zahur. And I'd like to reserve two minutes for rebuttal. Your Honors, we raised three issues on appeal, but I just want to focus on one for today. And that seems to be the main one at the heart of this issue is whether the facet injections that were given were medically necessary or not. We argued in court that the government failed to present any evidence whatsoever that those facet injections were not medically necessary. In fact, government, in their brief on page 44, state that Zahur states there was, quote, no consensus in the medical community about the number of injections a patient may receive in one year. One, it wasn't Dr. Zahur who stated that. It was an OIG report conducted by the Department of Health and Human Services in 2008 that stated that. When we cross-examined the government's expert on Medicare, the government's expert admitted that injections were not medically necessary. That the number that is used, that the government was using, that you could not give a patient more than four facet injections per year was not really, was a recommendation at best. And when I directly cross-examined them and I asked them, well, so if a doctor was to give more than four facet injections a year, say 12 in a year, which is what my client is accused of, that would not be per se Medicare fraud. And he had to admit, no, it would not. The government did not present any sort of a medical expert in its case in chief or rebuttal to state that these facet injections being given to these patients was not medically necessary. Not one doctor came in and stated that. In fact, the patients... I thought they were treating long-term pain and these injections were for diagnostic purposes because they had a range of just a few hours, 48 hours. Am I mistaken? And I thought I read that in the government's brief and that was the entire reason why it was so improper to be injecting these things because they weren't usable for long-term pain. That is just one use, Your Honor. That is not a rule that says you can only be used for diagnostic. That's our point. Nobody came in from the government's case... What's the theory for why they would be appropriate for long-term pain if the science says that they're going to wear off after six hours and they're very painful? A lot of things are painful, but legally when we're talking about Medicare fraud and we're talking about fraud in this case, it has to be a determination made by the doctor. What is medically necessary and what is not medically necessary? At that time, the medical community did not even know how many facet injections should be given. When are they medically necessary and when are they not medically necessary? So that's what the doctors were facing at this point. In fact, I urge you to go back and read the 2008 OIG report on facet injections, which clearly states that 63% of the doctors are not giving them correctly. So there was a lot of confusion as to when they're necessary and when they're not necessary. The issue was the type of patients that these doctors were facing all had back pains. In fact, the patient that the government presented against Dr. Zahur, at the end when I asked her, well, would you go to this doctor again and say yes, I said, well, did your back pain, was it alleviated? She said yes. The issue did not stay, so they had to keep coming back for more and more injections. Now, should the doctors have not given four facet injections, six injections, eight injections? That we don't know, because there was no expert that basically came in and said, what in these patients, what is the appropriate amount of facet injections, if at all? If at all. All it was was the government kept on stating that since every single patient received a facet injection, every single time, therefore, that was per se Medicare fraud. Without presenting any medical evidence to state why that is the case. But why, wasn't there a theory that it was, the patients were doing this in exchange for opioid prescriptions, right? So whether it was medically necessary, I mean, that's not the point of their case. Their case was, hey, you're doing, you want a bill for this, in exchange you're going to give these prescriptions. Whether it was medically necessary or not medically necessary is secondary to the exchange that was going on. And then the fraud. Respectfully, Your Honor, I would disagree. Disagree that that wasn't the government's case, or you don't think that they proved their case? Both, Your Honor. I think the government's case was that these facet injections were medically necessary and that's what constituted the fraud. Medically not necessary. I'm sorry, medically not necessary and that's what constituted the fraud because they were billing for procedures that were medically not necessary. And another one that they argued was that they were doing that for the opioids. But their main case in chief, and they argue that in their appeal, they've argued that in their summation throughout, was the fact that these facet injections were not medically necessary. But the only evidence, and I mean the only evidence the government has... Didn't they also argue that you were, that they were billing for something other than what they were doing? Your Honor, one of the arguments was that they were billing for more time with the patients. But again, the crux of it again is these medically unnecessary... Well, the government says, and it's brief, he used the facet joint billing code for injections that he knew were not facet joint injections. So they were some type of other injection. Once again, Your Honor, if those facet injections were medically necessary, then those billing codes would not be incorrect. But they would be incorrect if it was, if you say you're giving somebody one thing and you give them something that's completely different and you do that in order to get a higher reimbursement rate. I took that to be the government's point, but maybe it'll clarify. But he used the facet joint billing codes for injections that he knew were not those injections. Your Honor, and I'll go back and certainly review it from our rebuttal, but during the case in chief and during the government's entire... On trial, there was never an issue that there was anything other than the facet injections that were being presented. It was the facet injections that were being injected into the back. So they were charging for the facet injections. The billing codes issue came in when they were not, and the government argues that they were seeing patients for a smaller amount of time than they were billing for. And that was one of the things that came out. And the other thing that came out was, of course, the opioids, which, again, I don't think it was against my client, but it was against the labs and all those things. But the injection that were being given, it was not fake injections. They were not something that was other than... They were facet injections. As far as the coding issue, the only coding issue that I recall that came into trial was the fact that those facet injections were given every month when the local LCDs stated they should have been given four times. But again, when I challenged the government's own expert on LCDs, he himself had to admit that that is not a rule. That is a recommendation that's placed. And I asked him the direct question. So if a doctor gave facet injections every month, because in his opinion he felt that's what the patient needed, would that violate the LCD and would that violate Medicare fraud? And he said, no, it would not. And once again, I would point out the OIG... I'm sorry, is this a sufficiency argument? Yes, Your Honor. Yes, Your Honor. My point is... I was confused with this. Did you file a Rule 29 motion? I did not, Your Honor. So what's the standard of review for us? Your Honor, we did file a motion for a new trial and we did raise this argument in the motion for a new trial and I do believe that that satisfies the standard that the court has set forth. If it's egregious, and I believe in this case it is egregious, there is absolutely zero evidence of medical unnecessity in this case. Okay. Thank you, counsel.  Good afternoon. May I please the Court? Ronald Chapman on behalf of Dr. Pappas. I would like to raise two issues. One related to sufficiency of evidence. The second related to calculation of the loss amount. But before I do so, I would like to answer two of the Court's questions that were raised with Brother Counsel. The first is the short-acting nature of Marcane that was used. That was a significant event at trial. I'd like to point out first that that testimony came from a lay witness, a co-defendant who pled guilty and was testifying on the witness stand and testified to the impact of Marcane. It was later rebutted by defendants when they testified on the stand that Marcane actually is a fast-acting drug but does have additional impact on the spine that may provide longer-acting impact for patients. This is how all of these physicians were trained by a prior physician and they all learned to use that fast-acting drug on the spine. The second question was related to doing one type of injection but billing the other. I believe that the government has raised trigger points as the type of injection that was conducted versus facet injections, which is what was billed for. Trigger point injections are a cheaper procedure, very easy to do with a shorter needle. The government has argued that the length of the needle is evidence that the wrong injection was being conducted here. However, once again, that testimony only came from a lay witness, someone not testifying as an expert who was a co-defendant testifying pursuant to a cooperation agreement. The government had every opportunity to select an expert witness, and in fact they did, to get a report drafted, in fact they did, present that expert witness on the witness stand to establish the standard and they chose not to do it. Instead, relying on Mr. Quindosa. That brings me to my sufficiency of the evidence argument. Brother Counsel talked a lot about the LCD. I'd like to walk through LCDs briefly. First, Medicare specifically says that a procedure must be reasonable and necessary to be billed for. Medicare contractors, private entities, establish local coverage determinations. Azhar V. Alina teaches us, a Supreme Court case, teaches us that these LCDs do not have the force and effect of law and should not be used to create substantive standards that physicians must adhere to. Medicare guidance specifically says medical necessity determines whether a procedure can be done or should not be done. It is the government's burden to establish that medical necessity through the use of a witness testifying to their opinion properly qualified as an expert witness with the ability to cross examine that person on their opinion. Again, the government did not do that. Instead, they offered Mr. Quindosa. Again, a private individual, not a government official who was under contract with Medicare. That witness testified that LCDs have the force and effect of law. Now, the government may argue that they didn't use LCDs to create a substantive legal standard, but I'd like to point to the closing argument and I don't have the citation, but Mr. Foster said the fastest way to go home is to ask yourself, when the defendants billed for five injections, did they know it was wrong? Specifically instructing the jury that five injections was wrong. Specifically instructing the jury that the LCD, the only expert testimony that was established, Mr. Quindosa's opinion set the legal standard for what is considered fraudulent and not fraudulent. The government failed to meet its burden and therefore has not provided sufficient evidence for a conviction. Was this addressed below? It was, Your Honor. It was addressed thoroughly by counsel and repeated objections as well as, I believe, a motion for new trial. Did the court make a determination that the LCDs do have the force of law? No, in fact, the court did instruct the jury that the LCDs don't have the force and effect of law. However, Mr. Foster continued even on rebuttal to instruct the jury five LCD injections equals fraudulent which is a misstatement. It's not true and that is not the law. I'd like to move on now to the loss amount argument. Can I ask a procedural question? So there was no Rule 29 motion, is that right? I do not recall if that was addressed in any defendant's Rule 29. I believe that one defendant filed a Rule 29 and multiple defendants joined it but I cannot recall if that was addressed. But you can't join somebody else's sufficiency of the evidence argument, right? I mean, that would be that's the entire reason we're here. You all think you have different arguments about sufficiency of the evidence so you addressed this in our brief. I believe because this is a common issue that affected all defendants, the lack of expert testimony to establish the standard, a defendant's joinder would be appropriate. This is not a nuanced issue related to a single defendant. Why wasn't Rashid's testimony itself sufficient? If they believed Rashid, then what? I mean, that suggests you were all engaged in a conspiracy to defraud. He testified to that effect. Well, he didn't have any medical training. In fact, that's why he hired physicians and that's why he intentionally instructed them not to work as many hours because you'll stay under the radar, so to speak. I mean, this is pretty damning testimony in terms of when we think of a sufficiency of the evidence challenge and how high that burden is. And Mr. Rashid's testimony may be appropriate to show that he instructed some members, but still for the fraud count, the standard must be established and that is what is medically necessary for injection to be billed for. The elements require a scheme and artifice to defraud. Under this case, defraud must mean billing for something that was not medically necessary. That is a question of medical standard, not of... So Rashid could have thought he was committing a fraud, intended to commit a fraud, but it turned out that they were medically necessary, so it wasn't really committing a fraud. Well, and I don't know that Mr. Rashid specifically testified that he instructed the physicians to perform specific injections on specific patients. In fact, even the government concedes that 70% of patients received more than 6 injections, which suggests that all of the other patients didn't receive more than 6 injections. Defendants were free to select how many injections and if injections were to be performed on specific patients. With my last minute, I'd specifically like to get to the loss amount argument, and this one is relatively easy to cover. When we look at the sentencing transcript, volume 1, 2, and 3 for Dr. Pappas, we do not see any mention of specific facts that the judge used to determine the egregious loss amount in this case. The law in this circuit is that the judge must find facts, and it's an error to fail to find facts related to loss amount, and in this case, there were no facts. Now, the judge simply rested on the fact that the loss was pervasive, but simply saying pervasive does not give us the fact that we need in order to... Well, it's the fraud that's pervasive, right? If the fraud is pervasive, then basically the amount of loss is everything that was billed for because it was all part of the same scheme, and I believe the judge said that, found that. I mean, why wouldn't that be enough? The number... The total billing number was whatever it was, 100 million or something, 300 million. Anyway, it was in the record, so why is that not enough at that point? I believe the total was 108 million. A pervasive finding is very difficult to get to when only four patients have testified, when no medical expert has looked through a statistically relevant sample of the charts in this case. Well, it's four patients and it's cooperating witnesses, right, who were also participating in the conspiracy. So, it's not just the four, right? I mean, you have to take into account all of the evidence, and I... Cheat is apparently a major player in this whole scheme, and he's the one that's testifying. I don't know why that wouldn't be enough to show a pervasive fraud. Understood, Your Honor, but the concern here is that defendants treated these patients in varying ways. Again, 78% received more than six, the remaining received less than six. Some patients received relief. Some testified that they didn't receive relief from injection. Each patient is a case-by-case determination that should be made, and that's why overarching statements related to fraud are insufficient. We need to look at the medical care that was provided by these defendants. Thank you. May it please the Court, Dan Lerman for the United States. I'd like to start with the last two arguments about the injections and whether they were necessary. The government argued and showed both that the injections given every month to every patient in return for the opiate prescriptions were not necessary, and that the defendants lied about the injections that they did give. So, the evidence showed, and this is on page 39 of our brief, and Rashid testified to this, but other doctors testified to this as well, that they were told that they were not giving facet injections. They were told they were giving the injections to every patient, regardless of need, every month as a matter of policy. You say there were doctors testifying. Were they expert witnesses that were saying these were not necessary? They were not experts. There was Dr. Hawk, who was a co-defendant. There was Dr. Bellina, who was a co-defendant. Dr. Hawk was never challenged even on appeal. And there was Rashid's own testimony. There was testimony about where they gave them, how often they gave them, and there was Dr. Rashid. I'm sorry. Are they testifying as fact witnesses or as experts? They're testifying as fact witnesses, and I could get into this, but Dr. Bellina, who is the one challenged doctor who testified this, testified what I was doing was not a facet injection. Now, as we said in our brief, a doctor is allowed to testify about what he did, particularly a co-defendant who admitted to committing fraud and explaining why he committed fraud. For the same reason that a doctor can say that I gave the CPR and not a Heimlich maneuver, a doctor is allowed to say that these are facet injections. But there's also no dispute here. I mean, Dr. Pappas admitted to both the FBI and at trial that they committed fraud, that they gave injections that were not necessary, and he still gave them because it was the protocol. They all came back to the new tri-state entity that was created after Medicare found that 100% of the facet joint injections were not necessary. So they just changed the name from tri-state, tri-county, to tri-state, and the three doctors other than Dr. Omar came back and did the exact same thing. What do you make of the argument that, you know, if there's lots of room for medical disagreement, you can't say that it's, you know, outside the standard of care, you can't say that it's fraudulent as long as the individual doctor believed, at least with respect to Dr. Zahor, he's still raising this type of argument. So what's the best evidence that he didn't think they were medically necessary? Which doctor in particular? The one who, Dr. Zahor, I believe, is the one who still... Yeah, I mean, I do think we're in the position now where we're in this sort of weird counterfactual where they believe they committed fraud, they did commit fraud, what happens if it turns out that somebody else could have had a different good faith belief? The answer to that question is they were not charged or convicted for violating a standard of care. They actually knew that they were giving injections that weren't facet injections. They actually knew that it was not necessary. It's almost res ipsa loquitur. Are those two things the same? No, they're not the same, Your Honor. So they're different things. I mean, they're lies. They used patient templates that were pre-filled that said 80% relief. That was not true. They lied about the office visits. They took kickbacks in exchange for referrals for unnecessary urine testing and other ancillary services. They forced patients to endure these shots every single visit in exchange for opiate prescriptions. That is a paradigmatic fraud. There is abundant evidence that doctors... What was the evidence, the expert evidence that they were not medically necessary? There was no expert other than I think Dr. Quindozo who was an expert on the Medicare rules who testified as to what a facet injection is and what a trigger point injection is. And that testimony showed that a facet injection goes into the facet joint and that these did not. That facet injections used a 4-inch needle and they used a 1-inch needle. Facet injections use a steroid because that's long action and not just lidocaine or marcaine which is short-acting. We have the defendant's own testimony that they used the short-acting thing. We have Rashid who is not a doctor or an expert who testified that he told every single one of the defendants that what they were giving were not facet injections but that they should give them anyway because they have the highest reimbursement. That goes to this error or malfeasance in billing. But they're focusing on the evidence that these were not medically necessary. Yes, Your Honor. Well, there are multiple aspects to this fraud. On the medical necessity aspect of this fraud, Drs. Omar and Pappas admitted on the stand that it was fraudulent because they were not medically necessary. There's no reasonable dispute, I think, and this is what we said in her brief, that they gave shots that were not medically necessary. The only dispute is whether they knew it at the time and their defense is really a good faith or an intent defense. And they did get an instruction on the good faith defense. But when their co-defendants admit on the stand that these were not necessary and we defrauded, we committed a fraud, that's pretty persuasive evidence that they committed a fraud. So the only question is whether they knew it at the time and the evidence at trial shows that they knew it at the time. It was their intent. They rotated the injections and the billing codes to maximize the reimbursement. Medicare told them 100% of these were not necessary, Your Honor, and they came back and they still performed them. There is abundant evidence that they knew exactly what they were doing as their co-defendants all admitted on the stand. So I submit that... Why do the regulations limit the reimbursement to five or six a year? Is there a reason provided? And can you talk a little bit about the short-term acting? Is it something to do with that, that it's diagnostic? Yeah, I think it's related, Your Honor. So there are two types of injections, therapeutic and diagnostic. The therapeutic are supposed to be therapeutic, that is, work for a long time. That's why they're supposed to have a steroid in them, which is they're supposed to give you relief not just when you get the injection, but for a long duration. Sort of the way that maybe you get a cortisol injection, which is also a steroid. So what the regulations say is that if you're doing therapeutic injections, we limit it because it's supposed to work for long term. If it doesn't work after one or two shots, you do something called radiofrequency ablation, which is a different procedure that you can only bill twice a year for and is supposed to be longer acting. One of the defendants, I believe it was Dr. Betro here, refused to do radiofrequency ablation precisely because it was only allowed twice a year and therefore would not have resulted in as great a reimbursement. So they are related. The short-acting nature of these shots, which had no steroid, is one of the reasons why they're not supposed to be given very often. You're supposed to be treating patients' pain, not just diagnosing it. And when you treat the pain, you need to give a steroid, which none of these had and multiple people testified to. So that was abundant. Is that related to the billing issue? Because the one might have pain relief, but the one they were actually giving did not? Because it was just Marcane, I guess? That's one reason why the bills were wrong. They weren't facet injections. The other reason is it wasn't going into the facet joint. So they just weren't the same type of injections they were billing for. They took a billing code that would result in the highest reimbursement and they did it 6 to 12 times, sometimes less. But the evidence showed, and again, Pappas admitted, Omar admitted, the evidence showed they gave these to nearly every single patient every single month as a matter of course in exchange for unnecessary and dangerous opioid prescriptions that they knew the defendants were either abusing or selling on the street. This was a fraud from start to finish and the defendants knew it. And do you admit that it's not the law that it's limited to five? That regulation isn't binding? And that they can seek more if they legitimately thought it was medically necessary? Again, as I think Judge White pointed out, the jury was instructed that violation of the LCD is not a basis to convict. We did not argue that that was a basis to convict. The jury was instructed that violation of the Medicare rules can go to the defendants' knowledge and that's the purpose for which we used it. Well, what do you do with your friend on the other side suggesting and closing an argument you recently said something to the effect of or the prosecution counsel below said like five is enough for fraud or something? I submit that's a misstatement of the testimony. What they said was the fastest way to go home is to say did they know what they were doing? Well, did they know they were giving five? There was no objection to that testimony. And as we explained in our brief, the point there was it went to knowledge. If the question, and that I submit is the only question, whether they knew what they were doing or the fact that they knew that they were violating Medicare rules. And Dr. Pappas testified that he knowingly violated Medicare rules. But if they knew they were violating the rules, including the frequency utilization limit, then that goes to their intent. And that's all the counsel was saying at closing was that there are a lot of ways they violated the law here. There are a lot of ways they committed fraud. There's a lot of evidence that shows they knew it. I submit to you the fastest way to go home is to look to whether they knew about these limitations. But again, there was no objection at the time. And the jury was instructed by the judge that argument is not evidence, that guilty pleas are not evidence, and that the rules and regulations are not a basis to convict. So they were not told that it was a fraud to violate this. They were told that that is persuasive evidence of their knowledge, and we submit that it is. Were they instructed that they could take it into account for the knowledge or intent purpose? I believe the instruction said you cannot consider it as the basis to convict, but you can consider it. Evidence of violation of the rules and regulations is not evidence of fraud. However, you may, in the subsequent paragraph the court went on to say, you may consider it in establishing their intent. So that was part of the instructions, and the page that we cite for the first part of the instructions has a second part as well. Finally, on Dr. Omar's point, which now seems to be limited to a single reference to staying under the radar, a reference that I don't think was objected to and is not in his reply brief. I'm happy to go through them. The larger point here is, as this court stated in its bail order, there's nothing improper about referring to the defendants collectively in a co-conspirator case such as this. Yeah, but to assert an incorrect fact is somewhat different. I mean, if the prosecutor is relying on a meeting and he wasn't there, that's fairly prejudicial. I don't think the reference to staying under the radar is characterized as an incorrect fact. There's a lot of evidence that the prosecutor elicited at trial that Omar left at 2016 before this meeting took place. Multiple times when there was a question about what time period or what defendants you're talking to, there was an objection and it was cleared up immediately. They had the opportunity to clear this up, and I don't recall which particular instance this is, but the prosecutor here went to great lengths, and I think as Judge Murphy said, went through seriatim and did you tell this to patient X, did you tell this to patient Dr. X, Dr. Y, Dr. Z. This was a lengthy trial. There was a lot of evidence. In most of the cases, the evidence against all the doctors was exactly the same. But if there was any question about Dr. Omar, I mean, he admitted that they committed a fraud. The only thing is whether he knew that he was committing a fraud at the time. He told Dr. Rashid that these injections didn't work. Sorry, Mr. Rashid. Mr. Rashid said, fine, don't give them, but you're going to make less money. So what he did was he kept giving the injections so he could make more money. He was disciplined by the state regulatory authority and told by his lawyer not to go back to the clinic because they were doing bad medicine and they were giving opioid prescriptions that were not necessary. He went back and he did the same thing. Dr. Rashid told them all that this was the protocol to give patients these medications regardless of need and to give them opioid prescriptions in exchange for doing the facet injections. So that's all, I guess, goes to prejudice about whether the statement was reversible. So I agree with you on the seriatim point. I did look at those pages of the trial transcript and asking Rashid for each defendant. But I think counsel for Omar's point now is, as Judge White said, that if he had a separate meeting at a particular time and talked to Omar versus having this secretive meeting where all of them were together and they were all saying, okay, this is the way we can conspire to defraud the Medicare program. He didn't say that Omar was at the meeting. He used the word defendants, which Omar is now interpreting to have included him. And I understand he's one of the defendants. I get the point. But there was abundant evidence, testimonial evidence, about the meeting and who was there. I kept on saying the meeting was with the three other doctors, Dr. Pappas, Zahor, and Betro. There was testimony about the meeting from multiple perspectives. There was no confusion in the jury's mind that he was not at the meeting. Obviously, Dr. Omar himself could have made that point if he wanted to. There was abundant evidence about the dates that happened. There was evidence that when he met with Rashid, he wanted to work more than three shifts a week because he wanted to make more money. But he agreed, in effect, that to stay under the radar from the regulatory authorities, he would limit, contrary to his own monetary interests, the number of shifts that he worked. There was abundant evidence that they were taking steps to avoid detection. And this one offhand comment that I don't believe was objected to that was not raised in his reply brief that grouped the defendants together did nothing to undermine 15 days of evidence that assiduously went through the evidence against each and every doctor in and of themselves. And again, Dr. Omar concedes that they committed a fraud. He called Dr. Rashid a fraudster and he referred to the quack honchos that he had working for him. He was one of those doctors. He knew it at the time. And any miscommunication about whether he was one of the doctors at this meeting had nothing to do with what this court said in its bail order was overwhelming evidence of Dr. Omar's guilt. It was not misconduct and it was certainly not flagrant misconduct that warrants reversal. If there are no further questions, Your Honor, we would ask the court to affirm. The amount of loss, can you address that? Yes. Well, I think the court got to the right point which is there's no dispute that intended loss is something that can be done and used when it's the greater of the actual and intended loss amount. There's no dispute that the guidelines also speak to health care fraud in particular and say that in a fraud case against a government insurer the amount of loss is the amount of bills that you submitted. Now, Mr. Pappas does refer to some case law that suggests that the fraud needs to be pervasive. But we would submit this is a quintessential pervasive fraud. It was a fraud from the beginning. The entity was created with the express purpose to defraud Medicare because it was a trust-based system that paid first and asked questions later. The entire business model of this firm was fraud. It was a shots for pills scheme. It was a pill mill that also forced the patients to endure painful... What do you do with respect to... I thought when you're trying to hold a defendant liable for the entire conspiracy, we have case law suggesting you have to have particularized findings about the scope of the conspiracy and it was reasonably foreseeable to the defendant. I think Zohor is making this argument. Do you think the district court... I know you suggested that maybe he's waived it by not adequately raising it below, but setting aside the waiver issue, do you think the district court made sufficient factual findings to hold all of the defendants liable and the findings have to be kind of particularized to the defendant? I do, Your Honor. I mean, as Your Honor suggested, this was a complicated case with multiple defendants. Some of the findings were made in multiple sentencing decisions and then incorporated by reference. And I believe the court here expressly incorporated by reference the findings that she made with respect to Mr. Rashid. But I do think the findings here were sufficient. Well, I think there are two questions because one of Your Honor's questions goes to sort of the pervasiveness. The other goes to the reasonably foreseeable. I'm talking about not the pervasiveness. Okay, the reasonably foreseeable. I don't recall what findings she made about reasonably foreseeable or if this was preserved below. What I do know is that it was reasonably foreseeable. This was literally a conspiracy where they all joined together and said, we are going to defraud in this way. They knew how many hours each other were going to work. He expressly limited his shifts to four hours per week in order to stay under the radar because he was, quote, He knew exactly what his co-defendants were billing. He could have extrapolated his own billing and multiplied it by whatever to get to 40 hours a week or however amount this occurred. So I think there's really no conceivable question that the district court did not clearly err in determining that this was reasonably foreseeable and within the scope of the conspiracy here. Questions? I'm okay. Thank you, Your Honor. Thank you. Your Honor, to respond to Judge Murphy's point about the seriatim testimony from Rasheed, the prosecutor asked Rasheed, did you have a conversation with Pat Miller about this? Pat was about staying under the radar, answer. What about Omar? He said the same thing. I told him that if he wanted to work more than three days a week, he would then be in the top tier of prescription providers. Even if you believe that a conversation happened, which of course Rasheed had self-serving interest to say it happened, that doesn't prove that Dr. Omar had intent to commit fraud with these other co-conspirators. Couldn't the jury have inferred the intent from what your client admitted on the stand? Your Honor, we don't raise a sufficiency claim. So the answer could be yes, the jury could infer intent from Rasheed's uncorroborated testimony. Why wouldn't that make any evidence harmless? No, because the standard for harmless here is whether it's overwhelming evidence, not whether the jury could under some circumstances, looking at the evidence in the light most favorable to the government. Was there overwhelming evidence of intent? Absolutely not. Also, as to the point about Dr. Omar going back, his attorney told him to step down, and then Lara concluded the investigation, and then his attorney told him he could go back so long as he changed his practices, and he testified he did. This is trial day 13, 6260 to 6270. He said he reduced what he prescribed, whether that was correct or not, not the point. He went back on advice of counsel, so it wasn't like he went back because he had decided, I'm going to defraud Medicare after all. He went back because his lawyer said so. The government admits that they, in some instances, said, well, there was potpourri in vetro. Why not say that every time? Why say right before the jury goes to retire, they all got together to do X? I'm not hanging my head entirely on that statement. That's a pretty damning statement when the jury's had 15 days of trial, less than four hours of which was Dr. Omar's testimony. So misstating that fact, that evidence that was not in the record, that's damning, and I think alone requires reversal under Carter. We ask this court to reverse. Would you like me to talk about 3E1 or comment on the sentencing issue?  All right. Thank you. Thank you, Your Honors. Thank you, Counsel. Your Honors, I think the only thing I'd like to address and clear up is this issue related to Markain because it was my client that testified primarily to it on direct, Dr. Vitro. And what Dr. Vitro testified to was that Markain, in this particular scenario, it is normally a short-term acting anesthetic, but in this particular scenario, when injected in the region that it is injected to, acts as a longer-lasting pain relief medication. So that it combines with the cytokines and the other, and when it goes into that region, it's injected into that region, that it acts and has a long-term effect. And he testified that that's what he was taught by Dr. Pitino, that was his understanding, and that that was the relief that he believes that his patients were receiving when he gave those injections. And so I wanted to clear that up. I think that's come up a number of times. And the main reason I wanted to clear that up is because that testimony went completely unrebutted. The way for the prosecution to have rebutted that would have been to call an expert, and they did not call an expert. And I think the court has, a number of times in this argument, indicated or shown some concern with the fact that they did not call an expert. There was no expert in this case, and I think that that went completely unrebutted. Unless the court has any other questions, I... No. Thank you, Kevin. Thank you. Your Honor, I would submit that the only way to tell whether these procedures, the set injections, were medically necessary or not is to have some expert up there basically looking at the charts and saying, based on the charts that we've looked at, these procedures were not medically necessary or these procedures were medically necessary. Well, what about admissions from co-defendants? Your Honor, co-defendants stated... They never stated that, well, giving these set injections were wrong. They stated, well, giving every patient the same thing, that was wrong. We knew that there was something wrong. There was not one single defendant that basically went up and stated, well, yes, it was wrong. There was one doctor who had a tremendous amount of experience in this that I cross-examined and I said, well, when you first got there and you saw these set injections were given, did you think it was wrong? And he said, no, after a while I did. Nobody stated that, well, yeah, we got in there, it was wrong. What they stated and what the government kept on arguing and is still arguing is that giving it to every patient all the time, 100% of the time, and that's what the jury took and said, well, that can't be right. That should not be the standard. There has to be a finding of, well, these are medically necessary or not. These patients all had back pains. Every single one of them had back pains. Even the patient that testified against my client, government's own witness, said her back felt better. The three defense witnesses that we brought in said, hey, did your back feel better? Did you feel anything was wrong? No, back felt great. I could walk. I was not on a walker. So to say that these were not medically necessary is just factually incorrect at this point because we don't know that. The government never raised it. The only law they raised, the only law they raised, the LCD determinations, and the LCD determinations are not law. And even if they were, their own expert on that who was a layperson admitted that four is just a recommendation. It's not a bright line rule that if you go over four, automatically it's Medicare fraud. So the issue for this court is, was there medical necessity in giving these facet injections? And this other issue about trigger injections, facet injections, that's completely a red herring. The government did not argue in their case nor was the indictment that, well, if it was facet injections, then it would be right. If it's not trigger, then it would be medically necessary. It was always facet. And the last point I would make is that the doctors, or at least Dr. Zahur and all the doctors, they were not the ones doing the coding. It was something else. It was other people. Thank you, Your Honor. Despite the government failing to raise a medical standard and establish a medical standard, they tried to make their case based on the testimony of cooperating co-defendant witnesses. Here, the LCD is wagging the dog. The co-defendants believe that the LCD sets the standard because Mr. Quendoza also believes that, the government's sole expert. As a result of that belief, they sit on the witness stand and say that anything over 5 must be considered fraudulent. Therefore, our conduct was fraudulent. The evidence in this case shows that not every patient was treated the same. 78%, again, received over 6. What do you make of the government's point that your own client testified that it was inappropriate to give injections to every patient? Thank you, Your Honor. I was going to raise that. The government has repeatedly said that Dr. Pappas admitted to the fraud. In fact, that's in the brief that was in the argument today. I invite the court to look at page ID 5679, 5680 through 5683. Dr. Pappas did not admit that his conduct was fraudulent. He did admit that he billed over the LCD amount, which, as we all know, is not prima facie fraud. Most of his testimony on cross-examination was about the urinalysis tests and the 56-panel drug screen, which he later learned was being billed for and which he later said, had I known that, I would have had an issue with that. The government has used that statement and twisted it throughout their brief and their argument today to suggest that this defendant admitted to fraud that is a red herring and should not be considered. I'd like to briefly discuss the last few seconds about the radiofrequency ablation that the government discussed. This is a very invasive procedure. This is burning of the nerves in the back. The LCD says you must do it, but again, medical decision-making should drive healthcare in this country, not LCDs. Doctors should drive healthcare, not LCDs. And if the government wants to say that these defendants violated a standard, they ought to show the standard with expert testimony. Thank you. Thank you, counsel. Thank you, counsel, for your arguments and your briefs. The case will be submitted.